UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ATHERTON RESOURCES LLC,

      Plaintiff and Counter Defendant,

v.

ANSON RESOURCES LTD., *et al.*,

      Defendants and Counter Claimants.

Case No. 3:17-cv-00340-MMD-CLB

ORDER

## I.   SUMMARY

Plaintiff and Counter Defendant Atherton Resources, LLC ("Atherton") was working with Defendant and Counter Claimant Anson Resources Ltd.[1] ("Anson") to help Anson identify and develop profitable mining projects, primarily of lithium, and mostly in Utah. Atherton sued Anson after Atherton realized that Anson was not going to pay Atherton amounts it expected to be paid under an agreement between the parties. The Court previously issued orders on the parties' competing motions to dismiss and for summary judgment (ECF No. 98 ("Summary Judgment Order")), and motions in limine (ECF No. 146). This case then came before the Court for a bench trial (the "Trial"). (ECF Nos. 162, 163, 164, 165, 166 (trial minutes); *see also* ECF Nos. 167, 168, 169, 170, 171 (transcripts).) The Court's findings of fact and conclusions of law follow below. To preview, the term 'net production revenue' in the participation section of the agreement between the parties means 'net smelter return' and applies to an area of interest reflecting all claims staked by Anson in Utah's Paradox Basin ("Paradox Basin"), but Atherton's participation

---

[1]The parties stipulated to dismissal of claims Atherton asserted against Bruce Richardson. (ECF No. 92 at 3.)

interest does not run with the land, and Atherton has failed to meet its burden to show it is entitled to judgment in its favor on its remaining claims other than its claim for declaratory relief.

## II.    FINDINGS OF FACT

The Court makes the following findings of fact based on the testimony and other evidence admitted during the course of the Trial, along with the pre-trial and post-trial briefing the parties filed in this case.

To start, the Court incorporates by reference its recitation of the undisputed facts in the Summary Judgment Order, as the testimony at Trial did not render any of them inaccurate, and does not otherwise recite them here. (ECF No. 98 at 2-4.) As stated in the Summary Judgment Order, the agreement between the parties that is the focus of their dispute is an attachment to a July 7, 2016 email between Atherton's principal James McKay and Anson's principal Bruce Richardson. (Exhibit ("Ex.") 6 at 5 (the "Agreement").)[2] The Agreement covers a lithium mining project or projects in Utah (the "Project"). (*Id.*)

McKay and Richardson had previously entered into a confidentiality agreement in July 2015. (Ex. 5 (the "Confidentiality Agreement").) The Confidentiality Agreement generally covered information that Atherton provided to Anson as to a list of potential mining projects. (*Id.*) None of the potential projects on that list are located in the Paradox Basin. (*Id.* at 7-8.) However, when McKay and Richardson began discussing lithium projects in the Paradox Basin, McKay wrote to Richardson that he understood any projects McKay might present to Richardson in that area were covered by the Confidentiality Agreement. (Ex. 1 at 13.) Richardson never directly responded to this assertion by McKay, instead suggesting they talk on the phone. (*Id.*) However, Richardson testified at Trial he

---

[2]References to exhibits throughout this order are to the exhibits admitted at Trial. (ECF No. 167 at 3-4 (admitting Exhibits 1 through 146, Exhibits 150 and 151, and Exhibits 153 through 246 per the parties' stipulation, and noting that Exhibits 147, 148, 149 and 152, the parties' expert reports, were admitted for identification purposes only).) The parties subsequently amended the exhibit list, and stipulated to the admission of a few more exhibits. (ECF No. 172.)

1  agreed with McKay's assertion that the lithium projects they discussed in Utah, including

2  the Project, were covered by the Confidentiality Agreement. (ECF No. 170 at 191.)

3      At the time he entered into the Agreement on Anson's behalf, Richardson was an

4  experienced businessperson, with years of experience specific to the mining industry. (*Id.*

5  at 53-72.) During and after college, he worked for the Australian government for about

6  seven years, and spent about 15 years working in China, both for the Australian

7  government, and also for a company that made products out of Australian kangaroo

8  leather, Foster's Brewery, and a company called Boomers. (*Id.* at 53-56.) He also spent a

9  portion of his time in government focused on the mining industry. (*Id.* at 56.) After leaving

10  government, he worked for a mining company called Vector, which had a mineral sands

11  project in Columbia. (*Id.* at 56.) After working at Vector for some time, he helped found

12  Mayan Iron, which he later renamed Anson. (*Id.* at 57-60.) Anson became a publicly-traded

13  company in Australia back in 2010. (*Id.* at 60.) Richardson is Anson's Chairman and CEO.

14  (*Id.* at 61.)

15      Following Anson's acceptance of the Agreement, Atherton immediately began

16  working on the Project, and performed significant work on it. Atherton introduced Anson

17  to Voyageur (a third party that held 89 mining claims in the area of the Project), arranged

18  a confidentiality agreement between Voyageur and Anson, assisted with the term sheet

19  negotiations between Voyageur and Anson, identified and contacted experienced,

20  reputable consultants for geology, geophysics, environmental permitting, and drilling,

21  prepared a detailed due diligence work plan and budget, arranged for consultants to assist

22  with the Project, assisted with land status due diligence, assisted with negotiations and

23  document review for the joint venture agreement between Anson and Voyageur (Ex. 146

24  (the "Voyageur Agreement")), and prepared an exploration work plan and budget. (Exs. 8-

25  133; *see also* ECF Nos. 167 at 18-242 (McKay's testimony about his work on the Project);

26  ECF No. 169 at 207-218 (same); ECF No. 168 at 58-59 (agreeing that McKay provided

27

28

1
2

significant services to Anson, and Anson did not tell him to stop for some time); ECF No. 169 at 143-44 (describing McKay as a workaholic).)

3
4
5
6
7
8
9
10
11
12
13

At Trial, McKay testified that Anson never indicated to Atherton prior to April 2017 it did not understand the terms of its agreement with Atherton. (ECF No. 167 at 224.) Similarly, Richardson testified at Trial he never attempted to clarify the terms of the Agreement with McKay prior to April 2017, when Richardson offered McKay a different deal than the deal reflected by the Agreement. (ECF No. 170 at 198-99, 225-28.) On April 3, 2017, Atherton provided Anson with a base map and data for the Voyageur claims and the surrounding area. (Ex. 170; *see also* ECF No. 167 at 222-23; ECF No. 170 at 225.) On April 5, 2017, two days after receiving Atherton's work on the Project, Anson emailed Atherton proposed remuneration for its work that differed from the terms of the Agreement. (Ex. 231.) But Atherton rejected Anson's attempt to unilaterally change the terms of the Agreement. (Ex. 233.)

14
15
16
17
18

Shortly thereafter, Anson staked and filed approximately 202 additional mining claims in the areas identified by Atherton, outside of the 89 Voyageur claims. (Exs. 245, 246; *see also* ECF No. 170 at 178-79). Over the next several months, Anson staked and filed another 900 claims, and to date Anson has located and purchased 1230 claims nearby. (Exs. 106, 245, 246; *see also* ECF No. 170 at 179.)

19
20
21
22

As Atherton believed it had an interest in all of these properties under the Agreement, but Anson was only willing to pay Atherton a $60,000 finder's fee, some additional consulting fees, and a stake in Anson (Ex. 231) for all of the work Atherton performed, this lawsuit followed.

23

**III.   CONCLUSIONS OF LAW**

24
25
26
27

The testimony at Trial focused on the parties' competing claims for declaratory relief seeking the Court's interpretation of the terms of the 'participation section' of the Agreement. However, the parties also dispute whether Atherton is entitled to judgment in its favor on its breach of contract claim. (ECF Nos. 174-1 at 2, 17-18, 175 at 15-17.)

28

1   Atherton also argues it is entitled to judgment against Anson on its claims for breach of

2   the implied covenant of good faith and fair dealing, breach of confidence, and breach of

3   fiduciary duty—and Anson of course disagrees. (ECF Nos. 174-1 at 16-17, 20-22, 175 at

4   17-19.) The Court addresses each of these claims below.

5   **A. Declaratory Relief – Participation Section**

6   The Court already found in the Summary Judgment Order that the participation

7   section of the Agreement was "an enforceable component of the larger" Agreement. (ECF

8   No. 98 at 6.) Thus, to the extent Anson argued at Trial and in its post-trial briefing that the

9   participation section was fatally ambiguous and therefore unenforceable, the Court rejects

10  that argument.[3] Moreover, that argument is unsupported by the testimony that Anson's

11  principal Richardson offered at Trial. (ECF No. 170 at 83-88 (testifying that he

12  remembered entering into the Agreement).) The Court therefore focuses its analysis below

13  on interpreting the ambiguous terms (ECF No. 98 at 7-8) of the participation section of the

14  Agreement. The Court structures its analysis to align with the parties' identification of their

15  interpretive disputes in their post-trial briefing.

16  **1.    Net Production Revenue**

17  The parties first dispute the meaning of the term 'net production revenue.' Atherton

18  argues it means 'net smelter return.' (ECF No. 175 at 7-9.) Anson argues it simply means

19  'net.' (ECF No. 174-1 at 10-11, 14-15, 22.) Anson further defines 'net' as referring "to the

20  gross amount, less all bills, less all costs, everything so it is the bottom line." (*Id.* at 22.)

21  The Court agrees with Atherton.

22  The Court begins with the text itself, which is, "Atherton to receive 2.5 percent of

23  net production revenue." (Ex. 6 at 5.) As the Court previously stated, this term "appears

24  intended to give Atherton some sort of royalty or other ongoing stake in money earned

25

26  _____

27  [3]Anson also argued the Agreement was fatally ambiguous in a summary judgment

28  motion, and the Court rejected that argument in its Summary Judgment Order. (ECF No. 98 at 6.)

from whatever is pulled out of the ground by Anson from mining projects Atherton locates for Anson." (ECF No. 98 at 6-7.) Trial did not change the Court's view of the general meaning of these terms. Moreover, it is clear from the text that the 2.5 percent is of net revenue, which the Court generally understands to mean revenue minus certain expenses.

Indeed, when it comes to the disputed term 'net production revenue,' the parties agree to some extent—both of their proffered interpretations include the 'net' concept. (ECF Nos. 175 at 7-9, 174-1 at 22.) Both parties also appear to argue net generally means revenue minus expenses. (*Id.*) Thus, the dispute between the parties is really whether to use "net smelter return" as defined in the Voyageur Agreement (as Atherton advocates), or a less-precisely defined 'net' (as Anson advances). To the extent a dispute remains for the Court to resolve, the gap between the parties' understanding appears narrow. And the Court finds that Atherton's proffered interpretation is both easier to understand and better supported by the extrinsic evidence.

As to the practicality of choosing between the two proffered interpretations, the Court agrees with Atherton that using 'net smelter return' will make for easier administration going forward because it is commonly used in the mining industry, and therefore has a meaning that both parties will understand. It also has a precise definition in the Voyageur Agreement. In contrast, adopting Anson's proffered 'net' would be impractical because it begs the question—net what? Anson's proffered interpretation also ignores the other two descriptors present in the term—'production revenue.' *See Rd. & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377, 380 (Nev. 2012) (stating that courts must read contracts as a whole without negating any contract provisions). Adopting 'net' would likely lead to further disputes between the parties about its meaning. The Court thus determines that 'net smelter return' is a more workable choice.

As to the extrinsic evidence, both Atherton's principal McKay and its expert Marvel argue that 'net production revenue' is analogous to 'net smelter return.' (ECF No. 175 at

8.) Their argument is supported to some extent by the testimony of Anson's expert Cleveland because he agreed that 'net smelter return' is the most commonly-used term in the mining industry when it comes to royalties like the royalty the parties agreed to here. (*Id.*) Atherton also points to the fact that Anson used a specifically-defined version of 'net smelter return' in the Voyageur Agreement, and Cleveland's testimony that is 'supporting evidence' that 'net production revenue' is synonymous with 'net smelter return,' to further buttress its argument the parties agreed to 'net smelter return' when they agreed to 'net production revenue.' (*Id.*) Indeed, Anson also argues that the Court should look to the Voyageur Agreement—which McKay helped negotiate—to determine the meaning of 'net production revenue.' The Court agrees. As both McKay and Richardson were involved in negotiating that agreement not long after the Agreement, the Court can reasonably infer that they share an understanding of 'net smelter return.' And all of this extrinsic evidence suggests that 'net smelter return' is the correct interpretation of 'net production revenue.'

That said, McKay and Marvel both conceded on cross-examination that they had never seen the term 'net production revenue' in a mining contract other than this one. (ECF No. 174-1 at 10.) Neither had Anson's principal Richardson, consulting geologist Knox, or Anson's expert Cleveland. (*Id.*) There is thus no real dispute that 'net production revenue' is an uncommon term—which likely led to some of the dispute here. However, as discussed above, much of the extrinsic evidence proffered at Trial supports the view that McKay meant to use 'net smelter return' but instead used the uncommon and confusing 'net production revenue.' And having already found that the participation section of the Agreement is not insolubly ambiguous, the Court cannot simply throw up its hands and declare 'net production revenue' meaningless. The rarity of 'net production revenue' is not an insurmountable barrier to construing it as 'net smelter return.'

Richardson also testified that he was never sure what 'net production revenue' meant. But Richardson's testimony that he agreed to 'net production revenue,' but had no idea what it meant, is simply incredible. (ECF No. 170 at 84-87.) Richardson had

1   substantial experience as a businessperson at the time he entered into the Agreement,

2   including several years of experience in mining specifically (in addition to focusing on

3   mining for part of his seven years working for the Australian government). (*Id.* at 53-66.)

4   He even testified that he "had a lot of understanding about the lithium market and lithium

5   projects." (*Id.* at 62.) Someone with his experience would either understand a key

6   compensation term when he agreed to it, or seek clarification prior to agreeing. Thus, the

7   Court does not find credible his testimony that he did not know what he agreed to when

8   he agreed to the 'net production revenue' term. The Court accordingly gives Richardson's

9   testimony little weight in construing 'net production revenue.'

10   In sum, the Court finds that Atherton met its preponderance of the evidence burden

11   to establish that 'net production revenue' means 'net smelter return' as that term is defined

12   in the Voyageur Agreement.

13                           **2.      Whether the Interest Runs With the Land**

14   The parties' next major dispute as to the participation section is whether the 2.5

15   percent interest discussed above terminates when Anson sells its interest in a particular

16   property, as Anson argues, or runs with the land in perpetuity, as Atherton argues. (ECF

17   Nos. 174-1 at 14-15, 175 at 9-12.) Anson also argues that the 2.5 percent interest cannot

18   run with the land because, if it did, it would violate the statute of frauds. (ECF No. 174-1

19   at 19-20.) The Court agrees with Anson.

20   The Court again begins with the Agreement itself. The participation section is part

21   of the single-page Agreement, which also includes a finder's fee section, the meaning of

22   which the parties resolved by stipulation. (ECF Nos. 174-1 at 2, 175 at 6.) But the Court

23   must read the participation section along with the finder's fee section because it must read

24   the Agreement as a whole, without negating any contractual provisions. *See, e.g.*, *Rd. &*

25   *Highway Builders*, 284 P.3d at 380 (citation omitted). Looking at the Agreement as a

26   whole, the finder's fee section and the participation section are distinct, suggesting that

27   terms from one section do not apply to the other section unless explicitly stated. (Ex. 6 at

28

5.) And while the finder's fee section specifies that, "if the property is sold or joint ventured, the obligations set forth above in (a) and (b) go to the successor[,]" no such term exists in the participation section. (*Id.*) The structure of the Agreement therefore suggests that the terms in the participation section do not run with the land, or otherwise continue after 'the property' is sold. (*See also* ECF No. 174-1 at 10 (making this argument).)

The structure of the participation section itself further suggests that the terms of the participation section do not run with the land. The participation section contains two terms, one providing for ongoing payments, 2.5% of net production revenue, and the other providing for a one-time payment: "If the property is sold, Atherton to receive 2% of the sales proceeds." (Ex. 6 at 5.) Reading the terms together, the participation section is set up such that Atherton receives ongoing payments from 'the property,' and then a one-time payment if Anson sells or joint-ventures the property, presumably to compensate Atherton for the loss of the ongoing 'net production revenue' payments it received while Anson owned 'the property.' Accordingly, the structure of the participation section also suggests the Agreement does not give Atherton an interest that runs with the land.

In the preceding paragraphs, the Court has mentioned the Agreement's repeated references to 'the property.' And that leads the Court to its next point. 'The property' is not defined anywhere in the Agreement. (*See id.*) However, the title of the Agreement is 'Utah Lithium Project,' so the Court can reasonably infer the property must be located somewhere in Utah, and relate to lithium. (*Id.*) But beyond that, the Agreement does not specify. Indeed, Atherton's expert Marvel testified the Agreement does not specify what the property is, though normally mining industry participants would specify the property that an agreement relates to. (ECF No. 169 at 165-166.) Marvel also made the reasonable point that the lack of clarity in the Agreement is likely what led to this litigation. (*Id.* at 165.) That is probably true. In any event, it is unclear what 'the property' is in the Agreement.

The Court will discuss this issue in more detail, below, as to the scope of the area of interest. However, the lack of clarity as to 'the property' is also relevant to this question

1    of whether Atherton's 'net production revenue' interest runs with the land. As Anson

2    argues (ECF No. 174-1 at 19-20), for Atherton's interest in the property to run with the

3    land, it must comply with Nevada's statute of frauds, which, in turn, requires that the

4    boundaries of the property be "ascertainable from the memorandum." *Wiley v. Cook*, 583

5    P.2d 1076, 1080 (Nev. 1978) (citation omitted). The boundaries of 'the property' are not

6    ascertainable from the Agreement. (Ex. 6 at 5.) They are also not ascertainable from the

7    email thread containing the Agreement. (*See generally id.*) And there is no other document

8    to look to that could reasonably constitute 'the memorandum.' Thus, the Court finds that

9    Anson's statute of frauds argument further supports its finding that Atherton's net

10   production revenue interest does not run with the land.

11          The Court also rejects Atherton's argument to the contrary. (ECF No. 175 at 10-

12   12.) In arguing that the Agreement sufficiently identifies the property at issue, Atherton

13   points only to the title of the Agreement. (*Id.* at 11 (identifying the title of the Agreement

14   inaccurately as "ULI Lithium Project," when the Agreement is titled "Utah Lithium Project"

15   (*see* Ex. 6 at 5)).) As mentioned, the Court finds the title insufficiently defines the relevant

16   property boundary or boundaries to create an interest that runs with the land. Moreover,

17   and as also mentioned, the email thread between McKay and Richardson that includes

18   the Agreement does not provide any further definition of what the boundaries of the

19   property or properties might be. (Ex. 6.) Any property related to lithium within Utah is

20   simply too broad. For example, in *Butler v. Lovoll*, 620 P.2d 1251, 1253 (Nev. 1980), upon

21   which Atherton relies (ECF No. 175 at 11), the property was identified as "1117 Miller and

22   Concord," which is much more specific than 'Utah Lithium.' And while Atherton's expert

23   Marvel opined that 'net production revenue' was a royalty that ran with the land because

24   "that's just common knowledge[,] he also identified "project" as a "broad word[,]" and was

25   unable to point to anything in the Agreement beyond its title that identified the property or

26   properties the Agreement supposedly applies to. (ECF No. 169 at 131-32.) The Court

27

28

therefore remains unconvinced the Agreement's title is a sufficiently specific identification of the property to satisfy Nevada's statute of frauds.

Finally, the parties dispute whether the "2% of the sales proceeds" term means 'gross sales proceeds,' as Atherton and its expert contend (ECF No. 175 at 15), or 'net sales proceeds' as Anson and its witness van Uffelen contend (ECF No. 174-1 at 23). Per the testimony offered at Trial, McKay assumed "sales proceeds" meant 'gross sales proceeds' when he drafted the Agreement (ECF No. 169 at 16), and Atherton's expert Marvel also testified it means 'gross sales proceeds' (*Id.* at 146-48), while Richardson stated he had a "guess at what it meant" at the time he entered into the Agreement (ECF No. 170 at 86), but did not say what that guess was, and Anson's witness van Uffelen testified that it meant 'net sales proceeds' (ECF No. 171 at 83-84). The testimony thus splits along party lines. But considering that "[a]mbiguous terms[4] should be construed against the party who drafted them[,]" *Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004) (footnote omitted), the Court will adopt Anson's proposed interpretation. "2% of the sales proceeds" means '2% of the net sales proceeds.'

In sum, Atherton's interest does not run with the land. It terminates whenever Anson sells its interest in a particular property, but Anson must pay Atherton 2% of the net sales proceeds from each sale if and when that happens.

### 3.    Scope of the Area of Interest

That brings the Court to the parties' third, related dispute about the interpretation of the participation section of the Agreement—the scope of the 'area of interest' ("AOI") the Agreement applies to, which is, in a sense, another way of discussing which properties are covered by the Agreement. Atherton argues the AOI is "all property interests acquired by Anson in the Paradox Basin," which is a geographic area in Utah. (ECF No. 175 at 12-

---

[4]The Court already found this term ambiguous as a matter of law. (ECF No. 98 at 7-8.)

1   14, 17-19.) Anson counters the AOI is the 89 claims identified in the Voyageur Agreement.

2   (ECF No. 174-1 at 12.) The Court agrees with Atherton.

3           While there is no dispute the AOI includes the 89 claims identified in the Voyageur

4   Agreement between Anson and Voyageur, the Court finds the preponderance of evidence

5   presented at Trial shows the AOI stretches beyond just those claims to include all property

6   interests Anson acquires, or has acquired, in the Paradox Basin. At Trial, Atherton

7   presented substantial evidence that it or its consultants analyzed, compiled, and provided

8   information to Anson regarding geographical, geophysical, drilling, and mineral

9   information outside the scope of the 89 claims referenced in the Voyageur Agreement.

10  (Ex. 41 (discussing issues beyond the claims in the Voyageur Agreement and in the entire

11  Paradox Basin); Ex. 42 at 3 (showing drill holes outside of the 89 claims in the Voyageur

12  Agreement); Ex. 51 (attaching a budget that includes review of land status for areas

13  surrounding the 89 claims in the Voyageur Agreement, evidencing that Atherton was

14  performing work for Anson beyond the 89 claims in the Voyageur Agreement); Ex. 73 at 8

15  (showing larger area than the yellow diagonal, which is the 89 claims in the Voyageur

16  Agreement); Ex. 74 (involving areas well outside of the 89 claims in the Voyageur

17  Agreement); Ex. 75 (showing another claim outside of the 89 claim block in the Voyageur

18  Agreement); Ex. 60 (showing that an Atherton representative would be reimbursed by

19  Atherton for performing work regarding an area outside of the 89 claim area in the

20  Voyageur Agreement); Ex. 84 (including bullet points of what needs to be done outside of

21  the 89 claim block in the Voyageur Agreement).) In contrast, Anson did not present any

22  evidence at Trial showing that Anson rejected this information falling outside of the 89

23  claims in the Voyageur Agreement, nor did it produce evidence establishing that either

24  party ever intended to limit the Agreement to the 89 claims in the Voyageur Agreement.

25          The Court also heard evidence that the 89 claim block in the Voyageur Agreement

26  did not exist at the time that Anson and Atherton entered into the Agreement. (ECF No.

27  167 at 42.) Richardson admitted that it was never Anson's intent to be limited to a small

28

1   block of claims, because Anson wanted to locate as many profitable claims in that area as

2   it could. (ECF No. 170 at 195-97.) Richardson further testified that, when he negotiated

3   the Agreement with Atherton on behalf of Anson, the AOI "was not limited in any way." (*Id.*

4   at 196.) In addition, Knox, Anson's director and consulting geologist, also testified that

5   Anson did not initially stake additional mining claims because the claims were not

6   available, further belying Anson's argument that the Agreement was always intended to

7   be limited to the 89 Voyageur claims. (ECF No. 171 at 28.) Additionally, Marvel testified

8   that industry custom suggests that the AOI would extend to the area for which Atherton

9   provided information to Anson. (ECF No. 169 at 139-143.)

10      The Court therefore finds the preponderance of the evidence shows that Atherton

11   and Anson intended to explore the additional areas in the Paradox Basin under the

12   Agreement, as set forth in Exhibit 170, and the AOI includes all additional claims that

13   Anson staked in the Paradox Basin in Utah.

14      **B. Breach of Contract – Confidentiality Agreement**

15      Atherton next seeks favorable judgment on a breach of contract claim it never

16   alleged. (ECF No. 175 at 15-17.) In its operative second amended complaint, Atherton

17   alleges that Anson breached the Agreement by repudiating it. (ECF No. 66 at 7-8; *see*

18   *also id.* at 1-8.) Atherton also argued it was entitled to summary judgment on its breach of

19   contract claim because Anson repudiated the Agreement. (ECF No. 89 at 22-23.)

20   However, Atherton's breach of contract theory started to change in the pretrial order,

21   where Atherton stated it sought a "determination as to whether Anson breached the

22   contract and/or the July 2015 Confidentiality Agreement between the parties[.]" (ECF No.

23   108 at 7.) Atherton next returned to its breach of contract theory being Anson's alleged

24   anticipatory repudiation of the Agreement in its pre-trial brief. (ECF No. 159 at 4-5.) But in

25   Atherton's concurrently-filed pretrial proposed findings of fact and conclusions of law,

26   Atherton phrased its breach of contract claim as encompassing both Anson's purported

27   anticipatory repudiation of the Agreement, and purported breach of the Confidentiality

28

1   Agreement. (ECF No. 160 at 11.) And while McKay and Richardson both discussed the

2   Confidentiality Agreement in their testimony at Trial, the bulk of their testimony was

3   devoted to the Agreement. In its post-trial briefing, Atherton argues it is entitled to

4   judgment on its breach of contract claim because Anson breached its obligations under

5   the Confidentiality Agreement. (ECF No. 175 at 15-17.)

6         The Court cannot find in Atherton's favor on its breach of contract claim as Atherton

7   requests in its post-trial briefing because it never alleged the breach of contract theory it

8   now advances in its operative complaint. (*Compare* ECF No. 66 at 1-8 *with* ECF No. 175

9   at 15-17.) As noted, Atherton's breach of contract claim in its operative complaint is based

10  on Anson's purported anticipatory repudiation of the Agreement, but now Atherton seeks

11  judgment on its breach of contract claim based on Anson's purported breach of its

12  obligations under the Confidentiality Agreement. (*See id.*) Granting Atherton judgment on

13  its breach of contract claim would thus violate Rule 8's notice requirement. *See* Fed. R.

14  Civ. P. 8(a); *see also Lehman v. Nelson*, 862 F.3d 1203, 1212, 1221 (9th Cir. 2017)

15  (vacating a damages award "because the complaints did not provide adequate notice" of

16  the theory upon which a party prevailed at the district court level, where the "complaints

17  focus almost exclusively on the $1.00 withholding under Amendment 14, and only vaguely

18  refer to any withholding under Amendment 24."). And as Atherton bears the burden of

19  proof on its breach of contract claim, the Court must instead find in Anson's favor on this

20  claim.

21        In addition, even if the Court were to consider Atherton's breach of contract theory

22  based on Anson's purported breach of the Confidentiality Agreement, the Court would not

23  find in Atherton's favor because Atherton has failed to show how it has been damaged as

24  a result of Anson's purported breach. *See Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp.

25  2d 1234, 1240 (D. Nev. 2008) ("A plaintiff in a breach of contract action must show: (1) the

26  existence of a valid contract; (2) a breach by the defendant; and (3) damage as a result of

27  the breach.") (citations and quotation marks omitted). Specifically, the remedy Atherton

28

14

1   seeks is entirely disconnected from Anson's purported breach of the Confidentiality
2   Agreement. (ECF No. 175 at 17 ("this conduct was a breach of the Confidentiality
3   Agreement further justifying imposition of the 2.5% net smelter return royalty the [sic] runs
4   with the land on all property interests acquired by Anson in the Paradox Basin.").) In other
5   words, Atherton is asking the Court to rule in its favor on its declaratory relief claim. That
6   does not follow even from Atherton's breach of contract theory as described in its post-
7   trial briefing. In any event, the Court will direct entry of judgment in Anson's favor on
8   Atherton's breach of contract claim.

9       **C. Other Claims**

10      A "a plaintiff who has fully tried his case and who has neglected to offer evidence
11  sufficient to support a finding on a material issue upon which he bears the burden of proof"
12  is not entitled to judgment on that issue. *U.S. v. Dibble*, 429 F.2d 598, 601 (9th Cir. 1970).
13  That is the case as to Atherton's remaining claims for breach of the implied covenant of
14  good faith and fair dealing, breach of confidence, and breach of fiduciary duty. (ECF No.
15  175 at 17-19.) Atherton proffers no Trial testimony or other evidence in support of its post-
16  trial briefing on these issues (*see id.*), and the Court cannot recall Atherton's counsel
17  eliciting any pertinent testimony at Trial. Atherton only offers a conclusory argument that
18  Anson breached the Confidentiality Agreement to argue it is entitled to judgment on all
19  three of these claims. (*Id.* at 18-19.) Atherton therefore did not meet its burden to show it
20  is entitled to judgment on its claims, and the Court will accordingly direct entry of
21  judgment in Anson's favor. *See Dibble*, 429 F.2d at 601.

22  **IV.   CONCLUSION**

23      The Court notes that the parties made several arguments and cited to several cases
24  not discussed above. The Court has reviewed these arguments and cases, and has
25  determined they do not materially affect the outcome of this case.

26      It is therefore ordered that Court interprets the disputed terms in the participation
27  section of the Agreement as specified *supra* in Section III.A.

28

It is further ordered that both parties prevail in part on their declaratory relief claims, again as specified *supra* in Section III.A.

It is further ordered that Anson is entitled to judgment in its favor on Atherton's breach of contract, breach of the implied covenant of good faith and fair dealing, breach of confidence, and breach of fiduciary duty claims.

The Clerk of Court is directed to enter judgment accordingly, and in accordance with the Court's prior order (ECF No. 98), and close this case.

DATED THIS 30th Day of November 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE